NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS

## DIVISION ONE

CHARLES V.,
*Appellant,*

v.

DEPARTMENT OF CHILD SAFETY, C.V., J.V.,
TOHONO O'ODHAM NATION,
*Appellees.*

No. 1 CA-JV 20-0050
FILED 10-6-2020

Appeal from the Superior Court in Maricopa County
No.  JD36698
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, PC, Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellee Department of Child Safety*

Law Office of Justin Fernstrom
By Justin Fernstrom
*Counsel for Appellee Tohono O'odham Nation*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge D. Steven Williams joined.

---

**W E I N Z W E I G**, Judge:

¶1 Charles V. ("Father") appeals the juvenile court's order terminating his parental rights to C.V. and J.V. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2 Father and Mother are the biological parents of C.V., born in 2004, and J.V., born in 2012.[1] Mother is a member of the Tohono O'odham Nation ("Nation"), and her children are eligible for tribe membership. The Indian Child Welfare Act therefore governs this proceeding. *See* 25 U.S.C. §§ 1902, 1903.

¶3 Father was on probation for drug and weapons charges when C.V. was born. Before C.V. turned three, Father had served two short jail sentences and committed several probation violations. A year after J.V. was born, Father was arrested for assaulting Mother and for possessing marijuana. He pleaded guilty to domestic violence and drug charges and was placed on probation.

¶4 The couple soon separated. Father moved with the children into his mother's house. The children's Mother was rarely present. Father was arrested three more times between 2014 and 2016 for possession of heroin and violating probation. Father failed to appear in court and a warrant was issued for his arrest.

¶5 Father neglected the medical, dental and educational needs of both children. C.V. was often required to fill the parental void and care for his younger sibling, including feedings, diaper changes and getting J.V. ready for school. Both children fell behind academically and had excessive school absences.

---

[1] The juvenile court also severed Mother's parental rights, but she is not a party to this appeal.

¶6 Police again arrested Father in July 2018 after finding methamphetamine, heroin and a firearm in his home during a search related to a drug trafficking investigation. Police also learned that Father had an outstanding arrest warrant. Father was sentenced to 2.5 years in prison after pleading guilty to possession or use of narcotic drugs. Father left both children with his sister ("Aunt") and reported for his sentence in November 2018. Aunt soon contacted DCS because J.V. became "really sick" and Father had not authorized her to obtain medical treatment for the children. Mother could not be located.

¶7 DCS filed a dependency petition in November 2018. The juvenile court found both children dependent in May 2019 because neither parent was "willing . . . to meet their basic needs," citing Father's "long history" of substance abuse. Having established paternity, DCS told Father how he could achieve reunification. The Nation was invited to "all meetings" and updated on the children's status.

¶8 Both children attended individual therapy to address the trauma from living with Father. Information also surfaced that Father physically abused C.V. The children also enrolled in tutoring. Aunt encouraged them to explore their Native American heritage and worked with the Nation toward enrollment. She also obtained much-needed dental care for J.V.

¶9 The children did not want to visit Father in prison and no visits were arranged. The children had no "bond" with Father and "d[id] not wish to return to" him. Father still spoke with the children over the telephone every few weeks. Aunt later terminated the calls because of Father's "inappropriate" conduct.

¶10 DCS moved to terminate Father's parental rights to both children based on the length of incarceration for a felony offense under A.R.S. § 8-533(B)(4). Father moved to have his sister appointed permanent guardian. The juvenile court held a contested one-day severance and guardianship adjudication in late January 2020. The Nation was represented by counsel. Five witnesses testified, including Father, Mother, Aunt and the case managers from both DCS and the Nation. The court then terminated Father's parental rights to C.V. and J.V., finding that DCS proved the length of felony sentence statutory ground and that termination was in the children's best interests, emphasizing that it offered much-desired "permanency and stability." The court also found, under ICWA, that active but unsuccessful efforts were made to prevent the breakup of the Indian family, and that Father's continued custody would likely cause

serious emotional or physical damage to the children. Father timely appealed. We have jurisdiction under A.R.S. §§ 8-235 and 12-120.21.

## DISCUSSION

**¶11** Parental rights are properly terminated when the juvenile court finds clear and convincing evidence of a statutory ground for termination under A.R.S. § 8-533(B) and a preponderance of the evidence shows that termination is in the child's best interests. *Valerie M. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 331, 334, ¶ 9 (2009). ICWA requires two more findings here. The court must find "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); *accord* Ariz. R. P. Juv. Ct. 66(C). The court must also find evidence beyond a reasonable doubt that the continued custody of the children by the parent is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(f).

**¶12** We affirm a severance order of the juvenile court unless the record contains no reasonable evidence to support its factual findings. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286-87, ¶ 16 (App. 2016). We view evidence in the light most favorable to sustaining the juvenile court's findings, *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 234, ¶ 13 (App. 2011), and do not reweigh the evidence on appeal, *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 422, ¶ 27 (App. 2011).

### A. Length of Felony Sentence Statutory Ground

**¶13** Father first challenges the superior court's finding of statutory grounds under A.R.S. § 8-533(B)(4); he does not contest the court's best-interest findings. A juvenile court may terminate a parent's rights if it finds by clear and convincing evidence "[t]hat the parent is deprived of civil liberties due to the conviction of a felony . . . if the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." A.R.S. § 8-533(B)(4). A "normal home" refers to the incarcerated parent's obligation to provide a home in which that parent has a presence, not a "normal home environment created by [others]." *Maricopa Cty. Juv. Action No. JS-5609*, 149 Ariz. 573, 575 (App. 1986). The statute does not define "a period of years" and Arizona courts have not identified a definitive milepost at which "a sentence is sufficiently long to deprive a child of a normal home for a period of years." *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 29 (2000). Each case instead depends on its own facts. *Id.*

¶14 The Arizona Supreme Court has articulated six factors to determine whether a parent's incarceration compels termination of parental rights. *Id.* at 251-52, ¶ 29. These non-exclusive factors are: (1) the length and strength of any pre-incarceration relationship between parent and child, (2) how well the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive that child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue. *Id.*

¶15 The record contains reasonable evidence to support the juvenile court's decision:

¶16 <u>Length and strength of pre-incarceration relationship</u>. The record reflects that Father had a poor and sporadic pre-incarceration relationship with the children. He missed much of their childhood handling his "extensive" legal troubles. The children described no pre-incarceration "bond" with Father and "d[id] not wish to return to" him. The record shows that Father neglected the children for years, ignoring their basic medical and education needs. The record also shows that Father inflicted trauma on the children and physically abused C.V.

¶17 <u>Relationship during incarceration</u>. The children never visited Father in prison. They asked not to. Father wrote one letter to the children while incarcerated. He had several phone calls with the children, but Aunt terminated the calls for a time because of Father's inappropriate behavior. Nor has Father provided any financial support.

¶18 <u>Age of children, length of absence and deprivation of normal home</u>. Although not voluminous in absolute terms, Father's 30-month sentence represents a substantial and meaningful period in the children's development. C.V. will turn from 13 to 15 years old. J.V. will turn from 6 to 8 years old. And Father points to his earliest potential release date, but he must still enter drug rehabilitation afterward, which adds more time and uncertainty to any reunification. *See Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451, ¶ 18 (App. 2007). Nor did the record show that Father's return would mean a normal home.

¶19 <u>Available parent</u>. Mother abandoned the children. The children have no parent to provide a normal home life in Father's absence.

¶20 Father counters with conflicting evidence that supports his position, but we do not reweigh the evidence on appeal. *Alma S. v. Dep't of*

*Child Safety*, 245 Ariz. 146, 151, ¶ 18 (2018). Father also contends that 2.5 years is a "relatively short" prison sentence. Compared to what he faced, that may be true. But a prison term of 2.5 years can support termination based on length of felony sentence. *See Jeffrey P.*, 239 Ariz. 212, 214-15, ¶¶ 7, 10, 13-14 (App. 2016) (affirming termination based on a 2.5-year sentence). Our decision also must account for historical facts and particular circumstances, including Father's sporadic and traumatic presence in the children's lives. *Michael J.*, 196 Ariz. at 251, ¶ 29 ("In some instances, a 20-year sentence might not provide sufficient basis for severing an incarcerated parent's rights, while in another case a 3-year sentence could provide the needed basis.").

## B.    Active Efforts (ICWA)

**¶21**        Father contends that DCS did not provide clear and convincing evidence of "active efforts" to prevent an Indian family from breaking up. Father has shown no abuse of discretion. The Nation's case manager testified that active efforts had been made but did not succeed. The record also reflects active yet unsuccessful efforts, including the placement of siblings in a family home, the Nation's active role, children's counseling and phone contact while incarcerated. 25 C.F.R. § 23.2 (relevant efforts include invitations for child's tribe to participate, locating the child with family members and keeping siblings together). The Nation also worked with Aunt about tribal membership and Aunt encouraged the children to explore their heritage.

## CONCLUSION

**¶22**        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA

6